1

2

3

4

5

6

7

8                     **UNITED STATES DISTRICT COURT**

9                     **EASTERN DISTRICT OF CALIFORNIA**

10

11   DAVID WINKLER,                          )   Case No.: 1:18-cv-0099 - JLT
                                             )
12                       Plaintiff,          )   ORDER DIRECTING ENTRY OF JUDGMENT IN
                                             )   FAVOR OF DEFENDANT COMMISSIONER OF
13          v.                               )   SOCIAL SECURITY AND AGAINST PLAINTIFF
                                             )   DAVID WINKLER
14   COMMISSIONER OF SOCIAL SECURITY,        )
                                             )
15                       Defendant.          )
                                             )
16   _____ )

17          David Winkler asserts he is entitled to supplemental security income under Title XVI of the

18   Social Security Act.  Plaintiff seeks judicial review of the decision denying his application for benefits,

19   and the decision of the Appeals Council denying his request for review.  For the following reasons, the

20   administrative decision is **AFFIRMED**.

21                                     **BACKGROUND**

22          In October 2012, Plaintiff filed his application for benefits, in which he alleged disability

23   beginning March 6, 2012.  (Doc. 18-9 at 2)  The Social Security Administration denied the applications

24   at the initial level and upon reconsideration.  (*See* Doc. 18-4 at 2-17; Doc. 18-3 at 12)  Plaintiff

25   requested a hearing and testified before an ALJ on January 29, 2016, while represented by counsel.

26   (Doc. 18-3 at 12; *see also* Doc. 18-6)  The ALJ determined that Plaintiff would not be disabled under

27   the Social Security Act if he would stop his substance abuse and issued an order denying benefits on

28   June 9, 2016.  (*Id.* at 12-26)

                                             1

Plaintiff terminated his representation and filed a request for review of the ALJ's decision. (Doc. 18-3 at 42; Doc. 18-8 at 72-47)  On March 24, 2017, the Appeals Council notified Plaintiff that the Regulations governing review of a case were changing as of May 1, 2017.  (Doc. 18-3 at 33)  The Appeals Council informed Plaintiff the new rules would be applied to his claim, and his case would only be reviewed if: (1) the ALJ abused his discretion; (2) there was an error of law; (3) the ALJ's decision was not supported by substantial evidence; (4) there was "a broad policy issue that may affect the public evidence; or (5) the Appeals Council received additional evidence that Plaintiff showed was "new, material, and relate[d] to the period on or before the date of the hearing decision."  (*Id.*)  The Appeals Council informed Plaintiff that he "must show that there is a reasonable probability that the additional evidence would change the outcome of the decision."  (*Id.*) Although the new Regulations also require claimants to demonstrate good cause for the delay in the submission of evidence, the Appeals Council indicated it would "find that [Plaintiff] showed good cause" given the change in the governing standards while his application was pending.  (*Id.* at 34)  However, the Appeals Council reiterated: "You must still show that the additional evidence is also new and material, relates to the period at issue, and shows a reasonable probability of changing the outcome of the hearing decision." (*Id.*, emphasis omitted)

Plaintiff submitted nearly 150 pages of evidence to the Appeals Council, who looked at the evidence "but did not consider and exhibit [the] evidence.  (Doc. 18-3 at 3-4)  The Appeals Council found some of the evidence was "not new" because it duplicated several exhibits included in the record before the ALJ.  (*Id.* at 3)  In addition, the Appeals Council found Plaintiff submitted evidence that did "not relate to the period at issue," because it post-dated the ALJ's decision.  (*Id.* at 4)  Finally, the Appeals Council determined the remaining evidence did "not show a reasonable probability that it would change the outcome of the decision."  (*Id.*)  Thus, the Appeals Council denied Plaintiff's request for review on November 16, 2017, and the ALJ's determination became the final decision of the Commissioner of Social Security.

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact,

such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the

3

listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Evidence before the ALJ**

In June 2012, Plaintiff visited the Fresno Nephrology Medical Group, following a "CT that showed bilateral exophytic renal masses." (Doc. 18-12 at 7) Dr. Christopher Julian observed that Plaintiff had "no known syndrome" but reported he "had "some kind of food poisoning leading to the finding of bilateral renal masses." (*Id.* at 16) He noted Plaintiff had "strong personal beliefs concerning his own medical care and problems," which he "hope[d] … [would] not get in the way of his proper diagnosis and treatment." (*Id.*) Following a biopsy, Plaintiff was diagnosed with renal cell carcinoma. (*Id.* at 2, 5)

In July 2012, Dr. Steven Levy reviewed Plaintiff's symptoms and noted Plaintiff was "[p]ositive for almost everything including wide fluctuations in body temperature, weakness, sleeping disorders, and pain here, there and everywhere." (Doc. 18-12 at 5) Dr. Levy observed that Plaintiff had "a number of interesting theories related to … various genetic diseases that he may or may not have including G6PD deficiency, which [had] already been excluded and cystic fibrosis." (*Id.*) Dr. Levy ordered additional testing, which was negative for the mutations Plaintiff suspected. (*Id.* at 31)

Dr. Loan Nguyen, a neurologist, evaluated plaintiff in August 2012. (Doc. 18-12 at 25) Plaintiff reported he had pain that he rated as 3/10 in his stomach, flanks, left leg, left buttock, and low back. (*Id.*) She found Plaintiff's motor strength was 5/5 in his upper and lower extremities; and his senses were intact to touch, vibration, and proprioception. (*Id.* at 26) According to Dr. Nguyen, Plaintiff had reduced reflexes at 2/4 in his biceps, triceps, and knees; and 1/4 reflexes in his ankles. (*Id.*) She reviewed imaging of Plaintiff's lumbar spine and opined Plaintiff had lumbar spondylosis at the L4-L5 and L5-S1 level "without significant central spinal stenosis," and "[m]ild to moderate narrowing of the [right] L5-S1 neural foramen, and lateral recess." (*Id.* at 26) Dr. Nguyen indicated Plaintiff should see an orthopedic surgeon for evaluation of his hip pain and needed to see an oncologist "ASAP." (*Id.*)

In October 2012, Dr. Allan Hedberg reported he had been providing "psychological services" to Plaintiff for a year. (Doc. 18-14 at 45) He noted Plaintiff's "general health" was the subject of the therapeutic sessions. (*Id.*) Dr. Hedberg reported that he diagnosed Plaintiff with obsessive-compulsive disorder and adjustment reaction with mixed emotional features. (*Id.*) He recommended Plaintiff begin "an antidepressant on a trial basis" for several months, before Plaintiff consented to begin Zoloft on November 13, 2012. (*Id.* at 46)

Dr. Amneet Viri-Dulai evaluated Plaintiff "for … possibly underlying autoimmune disease" in November 2012. (Doc. 18-12 at 50) Plaintiff attributed his illness to "beans and Starbucks coffee," and told Dr. Viri-Dulai that he was diagnosed with a coffee bean allergy. (*Id.* at 49, 50) Dr. Viri-Dulai found Plaintiff had "good range of motion of all joints," "minimal tenderness over the left trochanteric bursa," and negative straight leg raise tests. (*Id.* at 51-52) Dr. Viri-Dulai noted Plaintiff did "not mention[] any symptoms concerning for an autoimmune disease," but ordered "some basic autoimmune workup" for Plaintiff. (*Id.* at 52) Upon receiving the results, Dr. Viri-Dulai opined the blood work was "unremarkable," and found no "evidence of an autoimmune disease." (*Id.* at 49)

Dr. Richard Engeln performed a psychological evaluation on May 17, 2013. (Doc. 18-13 at 4) He administered the Wechsler Adult Intelligence Scale 4th Edition, Wechsler Memory Scale IV, mental status exam, and review of Plaintiff's diagnostic history. (*Id.*) Plaintiff told Dr. Engeln that "his main symptoms" included memory problems; "a hard time standing, walking, sitting or lifting;" and joint pains. (*Id.* at 5) Plaintiff reported he was smoking marijuana for pain. (*Id.* at 6) Dr. Engeln observed that Plaintiff was "cooperative and calm," and his concentration was "[a]dequate for reception of all tasks." (*Id.* at 7) Dr. Engeln determined Plaintiff's full-scale IQ score was 103, which was average, but his perceptual reasoning and verbal comprehension were in the "high average" range. (*Id.* at 8, 9) According to Dr. Engeln, Plaintiff had "no psychological restrictions to do job adjustment," and any limitations "would be medical-physical in nature." (*Id.* at 9-10) Thus, he concluded Plaintiff had no limitations with the ability to understand, remember, and carry out tasks; concentrate; interact with the public, coworkers, and supervisors; and adapt to the usual workplace stresses. (*Id.* at 10)

On June 3, 2013, Plaintiff had a right open partial nephrectomy to remove his renal masses. (Doc. 18-13 at 19-20) He was discharged on June 7, at which time he "was tolerating a regular diet"

and "his pain was controlled with … pain meds." (*Id.* at 20) He did not receive pharmacologic therapy for his cancer. (*Id.* at 49)

Dr. Dan Funkenstein reviewed Plaintiff's medical record and noted Plaintiff obsessed "about physical issues real and imagined" on June 6, 2013. (Doc. 18-7 at 8) He opined Plaintiff was "[n]ot significantly limited" with his ability to carry out very short and simple instructions but was "[m]oderately limited" with the ability to carry out detailed instructions. (*Id.* at 20-21) Dr. Funkenstein concluded Plaintiff was "[a]ble to understand and remember work locations and procedures of a simple, routine nature involving 1-2 step job tasks and instructions" and was "[a]ble to maintain concentration and attention … in 2 hour increments." (*Id.* at 21)

Dr. Sadda Reddy reviewed Plaintiff's record related to his physical impairments and completed a residual functional capacity assessment on July 22, 2013. (Doc. 18-7 at 17-20) Dr. Reddy opined there was no medically-determinable impairment "on file that would account for the alleged degree of [activities of daily living] limitations." (*Id.* at 20) Dr. Reddy determined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour day, sit about six hours in an eight-hour day. (*Id.* at 17) Dr. Reddy also believed Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl. (*Id.* at 18)

In September 2013, Dr. Hedberg observed that Plaintiff would talk about "one topic and then all of a sudden… shift[] to another topic very abruptly." (Doc. 18-14 at 53) Plaintiff also appeared "[v]ery interested in the issues of Christianity and faith vs. reason," and Dr. Hedberg opined Plaintiff was "still all over the map." (*Id.*) Plaintiff continued to be "obsessed over the issue of religious thought, belief, and faith" in October and November 2013. (*Id.* at 54-55)

Dr. Hedberg believed Plaintiff was "much calmer" and "much more relaxed" on December 2, 2013. (Doc. 18-14 at 56) In addition, he opined Plaintiff was "not as argumentative" and "[m]ore reasonable." (*Id.*) Dr. Hedberg observed that Plaintiff was "doing much better due to the medication he [was] on." (*Id.*)

The same date, Dr. Hedberg completed a "Short-Form Evaluation for Mental Disorders." (Doc. 18-14 at 60) Dr. Hedberg noted Plaintiff had "cut down greatly" on his cannabis use "in [the] past year." (*Id.* at 61) He indicated Plaintiff had been diagnosed with depression, anxiety, and obsessive

personality disorder.  (*Id.* at 60)  According to Dr. Hedberg, Plaintiff exhibited poor impulse control and manipulative behaviors, including an inability to "stay off certain topics."  (*Id.*)  He opined Plaintiff's thought processes were circumstantial, tangential, and loose; his judgment was mildly to moderately impaired; and his thought content included obsessions, compulsions, and phobias.  (*Id.* at 61)  Dr. Hedberg believed Plaintiff had "good progress [in treatment], especially since being placed on medication in the past 3 months."  (*Id.* at 62)

In January 2014, Dr. Joan Bradus reviewed Plaintiff's updated medical record pending his request for reconsideration of the denial of benefits.  (Doc. 18-7 at 34-35)  Dr. Bradus opined there was not "new and material medical findings to show worsening of physical impairments."  (*Id.* at 34)  She affirmed the findings of Dr. Reddy, finding Plaintiff was able to perform light work with postural limitations.  (*Id.* at 34, 38-39)

Dr. A. Garcia also reviewed Plaintiff's record upon reconsideration.  (Doc. 18-7 at 35-36)  Dr. Garcia opined Plaintiff had a mild restriction of activities of daily living; mild difficulties with maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (*Id.* at 35)

In March 2014, Dr. Hedberg wrote a letter to the Fresno County Superior Court regarding Plaintiff's request to be released from sex offender registration, reporting that Plaintiff entered into therapy with "seriousness and thoroughness."  (Doc. 18-16 at 60)  Dr. Hedberg indicated Plaintiff had benefited from therapy.  (*Id.*)

Dr. Hedberg observed that Plaintiff was "much better with his medication," but continued to "get into his obsessive-compulsive talk" in June 2014.  (Doc. 18-16 at 59)  Dr. Hedberg noted Plaintiff would "just go[] off on a different topic," and he could not control it.  (*Id.*)  Plaintiff's wife also attended the therapy session and "work[ed] hard at keeping him focused."  (*Id.*)

Plaintiff had imaging of his lumbar spine and left him on January 2, 2015, due to his reported pain. (Doc. 18-16 at 5-6)  Dr. Mariela Resendes determined Plaintiff had "[m]inimal degenerative changes of the lumbar spine," including narrowing at the L5-S1 level and facet hypertophy and narrowing at the L4-5 and L5-S1 levels.  (*Id.* at 5)  In addition, Dr. Resendes found Plaintiff's left hip joint was "well maintained," though there was "[a] small osseous bump… along the anterolateral

margin of the left hip" and a nodular density on the lateral aspect of the superior acetabulum. (*Id.* at 6)

In February 2015, Dr. Maria Baccaro began counseling Plaintiff. (Doc. 18-15 at 3) She noted that Risperdal helped with Plaintiff's obsessive thinking "but intrusive thoughts continue[d]." (*Id.*) Plaintiff acknowledged that he was smoking 1 gram of marijuana per day, and Dr. Baccaro diagnosed him with marijuana abuse. (*Id.* at 3-4) She gave Plaintiff a GAF score of 65.[1] (*Id.* at 4)

In March 2015, Plaintiff told Dr. Baccaro that he had decreased his marijuana use from 1 gram per week to ½ gram in 10 days. (Doc. 18-15 at 9) However, the next month, Plaintiff stated he was smoking about 1 gram of marijuana per week. (*Id.* at 8) Dr. Baccaro noted that she "again encouraged" Plaintiff to decrease and discontinue his marijuana use. (*Id.*)

Dr. Hedberg wrote to Dr. Baccaro on May 13, 2015 and observed that Plaintiff was "a complex case." (Doc. 18-16 at 64) Dr. Hedberg noted: "Neurospsychological testing indicates measurable memory loss, particularly related to the integration of information. He reports having frequent random thoughts. This suggests that he is not integrating new information during his sleep cycle. The hippocampus is implicated. This problem is consistent with research findings among those with a history of chronic and excessive use of marijuana, which is the case for David." (*Id.*)

In June 2015, Plaintiff told Dr. Baccaro he had not used marijuana for the past two months. (Doc. 18-15 at 6) He indicated that he spent most of his days on the computer and talking about religion in "a lot of atheist groups" on Facebook. (*Id.*)

Dr. Hedberg completed a medical statement on September 15, 2015. (Doc. 18-14 at 66-68) He opined Plaintiff had moderate limitations with the ability to understand, remember, and carry out simple instructions; and marked limitations with the ability to understand, remember, and carry out complex instructions. (*Id.* at 66) He also believed Plaintiff had extreme limitations with his ability to interact appropriately with the public, supervisors, and respond to usual work situations. (*Id.* at 67) According to Dr. Hedberg, Plaintiff exhibited impairment with mood stability, decision-making, memory function, judgment, impulse control, and perception of events. (*Id.*)

---

[1] Global Assessment of Functioning scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning... but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

## B. Plaintiff's Hearing Testimony

Plaintiff testified he completed some college and "a personal computer program" at Fresno Institute of Technology. (Doc. 18-6 at 6-7) Plaintiff said he last worked "[d]oing computer repair," and that he "stopped in early 2012." (*Id.* at 7) The ALJ questioned Plaintiff about his work history, and Plaintiff reported he "did warrant repair," and Plaintiff confirmed he also reported self-employment earnings. (*Id.* at 8-9) The ALJ asked Plaintiff whether he paid taxes when he was self-employed, and Plaintiff responded he did not. (*Id.* at 8) When asked why, Plaintiff responded he "lived in poverty the majority of his life," and "was raised in a cult called Christian Science where ... if something was wrong [they] were to ignore it and think it away." (*Id.*)

The ALJ also inquired whether Plaintiff was ever incarcerated when looking at the gap in Plaintiff's work history. (Doc. 18-6 at 11) Plaintiff confirmed that he was for "[a] few days" in 2002. (*Id.*) The ALJ asked Plaintiff what he was charged with and, after consulting his attorney, Plaintiff responded his "conviction was for annoying or molesting a minor." (*Id.* at 12) Because Plaintiff was "only [in] jail for a couple of days," the ALJ observed that it did not "account for why there's a five year gap in [the] treatment record," and Plaintiff agreed. (*Id.*)

He reported that he was no longer able to work due to "a few issues mostly with [his] brain and [his] spine." (Doc. 18-6 at 9) He stated he had "a herniated disc and a degenerative disease that there aren't any painkillers for." (*Id.* at 17) He said that he smoked "[a]bout a gram a day" of marijuana. (*Id.* at 10) Plaintiff testified one doctor advised him to stop, while "[o]ne doctor gave [him] a license to help … treat the pain." (*Id.*) When asked if a treating physician gave him the marijuana license, Plaintiff simply stated he "had an appointment" with the physician but did not answer whether or not the doctor did "anything else but write out this prescription." (*Id.* at 10-11) However, Plaintiff testified that he never returned to see the physician after receiving the marijuana prescription. (*Id.* at 11)

Plaintiff said he needed "to be reminded" to dress and bathe himself, but he would "do it on [his] own" if he was going "out for important things." (Doc. 18-6 at 13) He stated he could prepare meals with help, but he was "not allowed to use the stove anymore" after he "burned a couple of pots and pans." (*Id.*) Plaintiff said he was "supposed to" do the laundry but would "quite often forget" and his wife would do it instead. (*Id.*)

Plaintiff testified he spent "[m]ost" of his time— estimated to be about twelve hours a day— researching beans and the genetic deficiency called Favism. (Doc. 18-6 at 14)  Plaintiff said one of the things he would read about "was a ritual held for 2000 years where 15,000 people or upwards … would gather each year to drink the Kykeon." (*Id.* at 22) Plaintiff explained it "had a mystery ingredient and Pythagoras who told us his followers to stay far from fava beans was a priest in this cult." (*Id.*)  He acknowledged that physicians administered three tests for Favism, and he did not have it. (*Id.* at 14-15)

He reported that he spent about an hour or two on social media each day but did not have social contacts other than Facebook. (Doc. 18-6 at 14-15)  Plaintiff said he did not "have a single theist friend except for [his] wife," because he could not "stand the imagination, gas lighting crap… and [he] pretty much chased everyone away." (*Id.* at 15)  He stated that while he had friends on Facebook, he would "argue too much" because he wanted "to argue about religion." (*Id.* at 23) Plaintiff testified, "as long as I keep my mouth shut I don't get shunned by people anymore so I don't socialize very much." (*Id.*)

The ALJ asked Plaintiff if he could explain the analogy of Plato's cave, which Plaintiff wrote about in a document reviewed by the ALJ. (Doc. 18-6 at 22)  Plaintiff responded: "I think it has to do with the forbidden fruit and the knowledge of it between good and evil.  It was a five month brush with death and it was a nightmare, and the healing from it would normally be a wonderful thing except for I filled my brain with water." (*Id.*)

Plaintiff testified that he had seen two psychiatrists, but he was not currently seeing one. (Doc. 18-6 at 15)  He said he stopped seeing psychiatrists because "nobody would believe [him] and it infuriated [him]." (*Id.* at 16)

**C.    Vocational Expert**

Thomas Dachelet, a vocational expert ("VE"), testified before the ALJ and indicated he could "provide an impartial and neutral opinion on [the] case." (Doc. 18-6 at 24)  The VE reported he listened to Plaintiff's testimony and reviewed the record related to Plaintiff's work history. (*Id.* at 25) He indicated Plaintiff's past relevant work was "associated with the title electronics mechanic" in the *Dictionary of Occupational Titles*[2], DOT 828.261-022. (*Id.*)

---

[2] The *Dictionary of Occupational Titles* ("DOT") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v.*

The ALJ asked the VE "to consider a hypothetical individual who [had] the same age, education and previous work experience as the claimant." (Doc. 18-6 at 26) In addition, the ALJ indicated the "hypothetical person [had] the residual functional capacity to perform a full range of light work," including the ability to "lift and carry 20 pounds occasionally and 10 pounds frequently;" "stand and/or walk with normal breaks for about six hours in an eight hour day;" "sit with normal breaks for about six hours in an eight hour day;" and "frequently climb…, balance, stoop, knee, crouch, and crawl." (*Id.* at 26-27) Further, the ALJ indicated the individual could "understand and remember work locations and procedures of a simple routine nature involving one to two step job tasks and instructions," and "maintain attention and concentration with ease in two hour increments." (*Id.* at 27) Finally, the ALJ directed the VE to consider one who could "relate to and accept direction from supervisors;" "remain socially appropriate with co-workers and the public without being distracted;" and "be able to travel, avoid workplace hazards, respond to chance and set realistic goals independently." (*Id.*)

The VE opined an individual with this physical and mental residual functional capacity could not perform Plaintiff's past relevant work. (Doc. 18-6 at 27) However, the VE believed the hypothetical individual could perform light and unskilled jobs that did not include "transferable skills from previous work." (*Id.*) For example, the VE identified the following positions: palletizer, DOT 929.687054; garment sorter, DOT 222.687-014; and package operator automatic, DOT 920.685.082. (*Id.* at 27-28)

**D.    The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined first that Plaintiff did not engage in substantial activity after the application date of October 24, 2012. (Doc. 18-3 at 14) Second, the ALJ found Plaintiff's severe impairments included "chronic marijuana abuse, hypochondria, and obsessive compulsive disorder." (*Id.*) At step three, the ALJ determined Plaintiff's "impairments, including the substance use disorder, meet sections 12.08 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1." (*Id.* at 16) The ALJ also opined, "If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the

*Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements, and it may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

impairments listed." (*Id.* at 18)  Next, the ALJ found:

> If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform light work as defined in 20 CFR 416.967(b): he could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  He could stand and/or walk, with normal breaks, for about six hours in an eight-hour workday.  He could push and/or pull as much as he could lift and/or carry.  He could frequently climb ramps, stairs, ladders, ropes, and scaffolds.  He could frequently balance, stoop, kneel, crouch, and crawl.  He could understand and remember work locations and procedures of a simple, routine nature involving one- to two-step job tasks and instructions.  He could sustain an eight-hour day and/or 40-hour workweek schedule on a sustained basis.  He could relate to and accept direction from supervisors.  He could remain socially appropriate with co-workers and the public without being distracted by them.  He could travel, avoid workplace hazards, and respond to changes and set realist goals independently.

(*Id.* at 19)

With this residual functional capacity, the ALJ opined Plaintiff "would be unable to perform past relevant work," which required medium exertion.  (Doc. 18-3 at 24)  However, the ALJ found there were "a significant number of jobs in the national economy that the claimant could perform" if he stopped his substance use, including: palletizer, garment sorter, and package sorter.  (*Id.* at 25)  The ALJ determined: "The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance abuse."  (*Id.* at 26)  Therefore, the ALJ concluded Plaintiff was "not disabled within the meaning of the Social Security Act at any time from the date the application was filed through the date of the decision."  (*Id.*)

**E.  Evidence Presented to the Appeals Council**

Plaintiff submitted nearly 150 pages of evidence to the Appeals Council while his request for review was pending.  The Appeals Council addressed the documents as follows:

> You submitted medical records from Loan Nguyen, MD dated July 17, 2012 through April 22, 2015 (9 pages) and June 22, 2012 through September 27, 2012 (19 pages); Fresno Nephrology Medical Group dated July 9, 2012 (2 pages) and June 1, 2012 (2 pages); California Imaging Institute dated May 23, 2012 (2 pages); University Medicine Associates dated September 15, 2014 (1 page); Humaira Sadiq, MD dated June 11, 2012 through October 1, 2012 (19 pages); and Allan Hedberg, Phd dated November 13, 2012 through (8 pages), and October 2, 2012 through November 13, 2012 (3 pages). This evidence is not new because it is a copy of Exhibits 2F, 4F, 5F, 12F, 14F, 1 7F, 20F, and 21F. We did not consider and exhibit this evidence.
>
> You also submitted a statement from Alan Whistler dated March 16, 2016 (6 pages); a statement from Douglas Graves, PsyD dated April 30, 2014 (1 page); a printout of a forum posting dated October 22, 2015 (2 pages); critique/analysis from David MacDonnell (2 pages); emails and cover letters regarding favism dated December 17, 2014 through December 22, 2014 (5 pages); timeline from the claimant (17 pages); critique of Dr. Bauer's Neuropsychological Evaluation (9 pages); history of interaction

with doctors Sheikh and Sadiq (7 pages); Application for Disabled Person Placard dated June 1, 2012 (2 pages); essay on favism (22 pages); copies of emails between Dr. Hedberg and the claimant dated January 1, 2015 through November 26, 2015 (10 pages); and copies of emails with Dr. Hedberg regarding history of favism essay dated March 18, 2014 through December 17, 2014 (18 pages).

You also submitted a letter from David Crabtree, LCSW dated May 5, 2016 (1 page); a neuropsychological evaluation from Christopher Bauer, PhD dated June 3, 2016 (6 pages); medical records from Urology Associates dated May 25, 2012 through July 27, 2012 (2 pages); USCF Oncology dated June 4, 2012 (2 pages); Fresno Nephrology Medical Group dated October 29, 2012 (2 pages); Mid Valley Cardiology dated April 11, 2012 through April 13, 2012 (5 pages); Humaira Sadiq, MD dated May 23, 2012 through May 30, 2012 (3 pages) and April 3, 2012 through May 24, 2012 (16 pages); Raymond Kidwell, MD dated May 13, 2012 and May 21, 2014 ( 3 pages); Loan Nguyen, MD dated June 22, 2012 (6 pages) and June 22, 2012 through August 6, 2012 (10 pages); Baz Allergy, Asthma & Sinus Center dated April 23, 2012 (1 page); Heart Institute at Community dated June 1, 2012 (2 pages); Community Medical Centers dated May 15, 2012 through February 24, 2016 (17 pages) and March 22, 2012 through April 13, 2012 (16 pages); UCSF, Gastroenterology & Hepatology dated May 10, 2012 through July 5, 2012 (10 pages); list of medical visits from 2012-2016 (4 pages); Saint Agnes Medical Center dated April 29, 2012 through June 30, 2012 (6 pages); Sujatha Srikanth, MD dated November 6, 2012 (2 pages); Sante Community Physicians dated May 20, 2012 through June 4, 2012 (3 pages); UCSF/Soe Naing, MD dated July 19, 2012 (11 pages); Willow Urgent Care dated April 8, 2012 (2 pages); Pacific Gas & Electrical Company Medical Baseline Allowance Application dated June 1, 2012 (2 pages); visit summary from University Medicine Associates dated March 23, 2016 (1 page); and Quest Diagnostics dated May 25, 2012 ( 1 page). We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not consider and exhibit this evidence.

You submitted medical records from Fresno Surgical Hospital dated July 7, 2016 (3 pages), and Christina Maser, MD dated July 12, 2016 (4 pages). The Administrative Law Judge decided your case through June 9, 2016. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before June 9, 2016.

(Doc. 18-3 at 3-4)

## DISCUSSION AND ANALYSIS

Plaintiff suggests the ALJ and vocational expert were biased at the hearing. (Doc. 28 at 10-14) He focuses upon the decision of the Appeals Council to deny review based upon the submission of the additional evidence presented, arguing he "believes these items should be considered." (*Id.* at 16; *see also id.* at 14-26) Plaintiff has not challenged the ALJ's findings regarding his physical and mental abilities, or the conclusion that substance use was a material factor. (*See generally* Doc. 28)

The Commissioner declined to "attempt to understand Plaintiff's brief, but ... set out an explanation of the analysis" related to substance use "and how the ALJ applied it." (Doc. 29 at 18) The Commissioner asserts substantial evidence supports the ALJ's findings, and the administrative decision

to deny benefits should be affirmed.  (*Id.* at 19-27)

**A.    Review by the Appeals Council**

The Regulations govern when Appeals Council is obligated to review additional evidence submitted after the ALJ issues a decision. *See* 20 C.F.R. §§ 404.970, 416.1570 (effective January 17, 2017).  The Regulations indicate that the Appeals Council "will review a case if ... the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5).  Evidence is new if it is not duplicative or cumulative. *Meyer v. Astrue*, 662 F.3d 700, 704-05 (4th Cir. 2011). In addition, evidence can be deemed new if it was not available when the ALJ made issued the decision. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003).

1.    Consideration of evidence

The Ninth Circuit has distinguished between evidence the Appeals Council "considered" and evidence the Appeals Council merely "looked at" to determine whether the additional evidence was incorporated into the record.  The Court explained that evidence the Appeals Council *considered* becomes part of the administrative record as "evidence upon which the findings and decision complained of are based." *See Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1162 (9th Cir. 2012).  In contrast, where "the Appeals Council only *looked at* the evidence... the new evidence did not become part of the record." *Amor v. Berryhill*, 743 F. App'x 145, 146 (9th Cir. 2018) (emphasis added); *see also De Orozco v. Comm'r of Soc. Sec*, 2019 WL 2641490 at*11 (E.D. Cal. June 26, 2019) (observing that the Ninth Circuit has distinguished between instances where the Appeals Council formally considered evidence and made it part of the administrative record with instances where the Appeals Council only looked at the evidence). Importantly, where the Appeals Council only looks at the evidence and it does not become part of the administrative record, the Court "may not consider it." *Amor*, 743 F. App'x at 146; *see also Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003).

The Appeals Council indicated that it reviewed the new evidence from Plaintiff and determined it: (1) was duplicative of evidence previously admitted into evidence, (2) did "not show a reasonable probability that it would change the outcome of the decision," and (3) did "not relate to the

period at issue." (Doc. 18-3 at 3)  Therefore, the Appeals Council indicated it "did not consider and exhibit this evidence." (*Id.* at 3-4)  Because the Appeals Council did not *consider* the evidence but merely looked at it,  the documents submitted were not incorporated to the administrative record subject to the Court's review, unless Plaintiff meets his burden to demonstrate the evidence should have been considered. *See Amor*, 743 F. App'x at 146; *Lowry*, 329 F.3d at 1024.

### 2. Plaintiff's burden

When the Appeals Council fails to "consider" additional evidence that satisfies the requirements of Section 404.970(b) or 416.1570(b), a remand for further administrative proceedings is appropriate. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011).  A claimant has the burden to demonstrate the evidence should have been considered by the Appeals Council under the Regulations.  *See Hawks v. Berryhill*, 2018 WL 6728037 at *4 (M.D.N.C. Dec. 21, 2018) (noting under the amended Regulations, "a claimant's burden to have new evidence considered for the first time at the Appeals Council level" includes "a requirement to show a reasonable probability of a different outcome").

Plaintiff contends the Appeals Council should have considered the evidence submitted because it did "not consist of the same data entered into the original record for consideration as detailed." (Doc. 28 at 16) Notably, Plaintiff does not dispute the Appeals Council's finding that some of the evidence submitted duplicated exhibits already entered into the record with "Exhibits 2F, 4F, 5F, 12F, 14F, l 7F, 20F, and 21F." (*See* Doc. 18-3 at 3)  To the contrary, Plaintiff cites Exhibits 2F, 12F, 17F, 20F and 23F in noting the similarities of the information provided.  (*See id*. 28 at 18-20) Thus, the Court will not disturb the finding that Plaintiff submitted duplicate evidence.

Further, Plaintiff fails to identify any objective findings in the record that undermine the ALJ's findings regarding his physical and mental abilities and limitations, or the conclusion that Plaintiff's substance use was a material factor.  Rather, Plaintiff repeatedly refers to *subjective* statements in the additional evidence.  For example, Plaintiff emphasized that records from Fresno Nephrology Medical Group dated October 29, 2012 indicated Plaintiff was "[p]ositive in every possible way."  (Doc. 28 at 15, 22)  A similar observation was made in July 2012, when Dr. Steven Levy indicated Plaintiff was "[p]ositive for almost everything" upon his review of symptoms, including reported "wide fluctuations

in body temperature, weakness, sleeping disorders, and pain here, there, and everywhere." (Doc. 18-12 at 5) The physicians at Fresno Nephrology Medical Group ordered genetic testing and determined Plaintiff did not have the genetic mutations Plaintiff suspected. (*Id.* at 31) Likewise, Dr. Viri-Dulai found Plaintiff's blood wok showed "found no "evidence of an autoimmune disease." (*Id.* at 49) Because Plaintiff fails to identify any evidence among the documents submitted to the Appeals Council addressing the severity of his impairments, the effect upon his physical or mental abilities to do most jobs, or the materiality of his drug use, the Appeals Council did not err in concluding Plaintiff failed to carry the burden to show "a reasonable probability that it would change the outcome of the decision." *See Matthews v. Shalala,* 10 F.3d 678 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability"); *see also Nottoli v. Astrue,* 2011 WL 675290, at *3 (E.D. Cal. Feb. 16, 2011) ("recitation of a medical diagnosis does not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities").

Finally, Plaintiff fails to show that evidence post-dating the ALJ's decision is, in fact, relevant to the period adjudicated. As noted by the Appeals Council, Plaintiff "submitted medical records from Fresno Surgical Hospital dated July 7, 2016 (3 pages) and Christina Maser, MD dated July 12, 2016 (4 pages);" but the ALJ decided the case "through June 9, 2016." (Doc. 18-3 at 4) The record dated July 7, 2016 is a "medication discharge summary," which is a summary of all medications Plaintiff received from July 6 to July 7, 2016 at the hospital. (*Id.* at 71-73) There is no explanation why Plaintiff was in the hospital at this time, such that the Court may determine whether it related to impairments addressed by the ALJ or find Plaintiff also received these medications during the adjudicated period. (*See id.*) Likewise, the records from Dr. Maser in July 2016 address Plaintiff's "*current* state," including his desire "to experiment with fava bean juice again and monitor the response of his body." (Doc. 18-5 at 49, emphasis added) Thus, these records do not relate to the period adjudicated.

Because Plaintiff fails to show the additional evidence was "new, material, and relates to the period on or before the date of the hearing decision" and that there was "a reasonable probability that the additional evidence would change the outcome of the decision," he fails to demonstrate error by the Appeals Council in merely looking at the evidence and not incorporating it as exhibits into the

administrative record.  *See* 20 C.F.R. §§ 404.970, 416.1570.

**B.    Alleged Bias of the ALJ**

Plaintiff suggests the ALJ was biased at the administrative hearing and acted improperly with the questioning regarding Plaintiff's work history, failure to pay taxes, incarceration, and conviction. (*See* Doc. 28 at 10-12)

Due process requires that administrative hearings be conducted by an unbiased adjudicator. *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982). The impartiality of administrative law judges is "integral to the integrity of the system." *Miles v. Chater*, 84 F.3d 1397, 1401 (11th Cir. 1996). Administrative law judges are presumed to be impartial and unbiased, but the presumption of impartiality can be rebutted by a claimant demonstrating "a conflict of interest or some other specific reason for disqualification." *Id.*; *see also Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999). A claimant asserting bias must demonstrate the ALJ's conduct, in the context of the entire proceeding, is "so extreme as to display clear inability to render fair judgment." *Rollins v. Massanari*, 261 F.3d 853, 857-858 (9th Cir. 2001), citing *Liteky v. United States*, 510 U.S. 540, 551 (1994). The claimant must establish "actual bias," rather than the "mere appearance of impropriety." *Bunnell v. Barnhart*, 336 F.3d 1112, 1115 (9th Cir. 2003).

Contrary to Plaintiff's suggestion, the transcript does not reveal any bias on the part of the ALJ in his questioning.  The ALJ did not demonstrate bias either in the manner in which he conducted the hearing or in the conclusions reached.  Rather, the ALJ is entitled to consider a claimant's work history, conviction for a crime of moral turpitude, and general reputation for truthfulness when evaluating the credibility of a claimant's testimony and subjective statements.  *See, e.g.*, *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (finding a claimant's poor work history was a relevant factor in a credibility evaluation); *Hardisty v. Astrue*, 592 F.3d 1072, 1080 (9th Cir. 2010) (finding the ALJ's credibility determination was substantially justified when it was based, among other factors, on the claimant's prior criminal convictions); *Albidrez v. Astrue*, 504 F.Supp.2d 814, 822 (C.D. Cal. 2007) ("[a]n ALJ may properly consider a claimant's poor or nonexistent work history in making a negative credibility determination," as well as "convictions involving moral turpitude"); *Farmer v. Colvin*, 2014 WL 3818510 at *16 (D. Ariz. Aug. 4, 2014) ("[c]onsideration of evidence of prior incarceration,

particularly for a crime of moral turpitude, is not error"); *Gainforth v. Colvin*, 2016 WL 3636840 at *5 (E.D. Va. May 9, 2016) ("failure to pay taxes brings [the claimant's] credibility into question"). Because the inquiries made by the ALJ were relevant to evaluate Plaintiff's credibility, the Court finds Plaintiff fails to demonstrate any bias based upon the questions asked by the ALJ at the hearing.

## C.    Alleged bias of the Vocational Expert

Plaintiff believes the vocational expert, Thomas Dachelet, was also biased against him at the hearing.  (Doc. 28 at 14)  Plaintiff speculates that Mr. Dachelet was biased because he "expressed irritation in his tone when given [an] answer to his ability to work, probably because [Plaintiff] said umm multiple times."  (*Id.*)

An ALJ may call a vocational expert "to testify as to (1) what jobs the claimant, given his or her functional capacity, would be able to do; and (2) the availability of such jobs in the national economy." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). When eliciting testimony from the expert, the ALJ may pose "hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration." *Id.* (quoting *Gamer v. Sec'y of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)).  Significantly, "it is well established that … vocational experts are not biased" and give impartial opinions.  *See also Simmons v. Berryhill*, 2017 WL 8777460, n.10 (N.D. Va. Dec. 22, 2017).

Prior to testifying, the vocational expert indicated he could "provide an impartial and neutral opinion on [the] case." (Doc. 18-6 at 24)  The ALJ merely questioned the vocational expert regarding the classification of Plaintiff's past relevant work and asked him "to consider a hypothetical individual who [had] the same age, education and previous work experience as the claimant." (*Id.* at 25-26)  In addition, the ALJ set forth a physical and mental residual functional capacity for the vocational expert's evaluation.  Plaintiff offers nothing more than speculation that the vocational expert was biased and irritated at the hearing.  Because there is no *evidence* of bias in the record, the Court finds the ALJ did not err in relying upon the testimony of the vocational expert.

## D.    Materiality of Plaintiff's Substance Use

To the extent Plaintiff believes the ALJ erred in his ultimate conclusion that Plaintiff that was not disabled, he fails to identify *how* the ALJ erred in his evaluation of the evidence.  The Ninth

Circuit "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant.'" *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)). Rather, the Court will "review only issues with are argued specifically and distinctly." *Id*. Therefore, when a claim of error is not argued and explained, the argument is waived. See, id. at 929-30 (holding that party's argument was waived because the party made only a "bold assertion" of error, with "little if any analysis to assist the court in evaluating its legal challenge"); *see also Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (finding the assertion of error was "too undeveloped to be capable of assessment"). Because Plaintiff failed to identify or discuss any alleged error in the ALJ's evaluation, he has waived any argument regarding the materiality of his substance use. Nevertheless, the Court finds the ALJ's determination that Plaintiff's use of marijuana was a material factor is supported by substantial evidence in the record.

If, considering a claimant's medically determinable impairments, there is a determination that the claimant is disabled, and there is medical evidence showing drug addiction and alcoholism, then the ALJ must determine whether the substance use is "material" to the finding that the claimant is disabled. 20 C.F.R. § 404.1535. The Social Security Act provides that a claimant "shall not be considered disabled" if the substance use is "a contributing factor material to the . . . determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). To determine whether a claimant's substance is material, the test is whether an individual would still be found disabled if he or she stopped using drugs or alcohol. *See* 20 C.F.R. §§ 404.1535(b), 416.935(b); *Parra v. Astrue*, 481 F.3d 742, 746-47 (9th Cir. 2007); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998). The ALJ must "evaluate which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). If the remaining limitations are disabling, then the substance use is not a material contributing factor to the determination of disability. See 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). The burden of proof is on a claimant to establish that his substance use is not a material contributing factor to his disability. *Parra*, 481 F.3d at 745.

The ALJ determined that Plaintiff's "mental impairments, including his substance use disorder, meet listings 12.08 and 12.09." (Doc. 18-3 at 17) However, the ALJ also found Plaintiff "would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed" if he "stopped the substance abuse." (*Id.* at 18) The ALJ opined: "The record contains extensive evidence of the claimant's chronic marijuana abuse as a significant exacerbating factor for his mental conditions." (*Id.* at 21) For example, the ALJ observed that "Dr. Bacarro encouraged him to decrease[] and discontinue marijuana use," and "Dr. Hedberg advised him to stop using any drugs, *i.e.* marijuana." (*Id.* at 22, citing Exh. 19F p. 6 [ Doc. 18-5 at 7], Exh. 21F, p. 2 [Doc. 18-16 at 51]) Further, the ALJ observed:

> Dr. Hedberg reported that neuropsychological testing indicated measurable memory loss, particularly related to the integration of information (Ex. 21F/15). Dr. Hedberg also noted the claimant reported frequent random thoughts, which suggested that he failed to integrate new information during his sleep cycle (Ex. 21F/15). *Notably, Dr. Hedberg opined that his condition was related to his chronic and excessive use of marijuana* (Ex. 24F/15).

(Doc. 18-3 at 22, emphasis added). In contrast, the ALJ noted that Plaintiff "demonstrated improvement" during a period of sobriety. (*Id.* at 22, 23) Specifically, the ALJ observed:

> When off marijuana, Dr. Baccaro noted his ability to engage with others online (Ex. 19F/5). Multiple progress notes documented the claimant's normal mood and affect when substance abuse stopped. For instance, in September 2014, a physician noted that he was "well groomed" and "pleasant" (Ex. 22F/11). At that time, the claimant showed a normal mood and affect. (Ex. 22F/l l). He was able to discuss medical issues in a rational way (Ex. 22F/l l).

(*Id.* at 18-3 at 23) The recommendations of physicians that Plaintiff stop using marijuana, the opinion that Plaintiff's "condition was related to his chronic and excessive use of marijuana," and findings regarding the difference in Plaintiff's mood and affect when off marijuana are substantial evidence in support of the conclusion that his substance use was a material factor.

For example, the Eighth Circuit reviewed an ALJ's determination that the claimant's marijuana use was a material factor of his disability in *Kluesner v. Astrue*, 607 F.3d 533 (8th Cir. 2010) The Court found substantial evidence supported the ALJ's conclusion that the claimant's substance use was a material factor, because a treating physician specifically recommended Kluesner "stop using marijuana" and another opined Kluesner's "use of marijuana contributes materially to his

dysfunction." *Id.*, 607 F.3d at 535, 537. Kluesner noted that one physician opined it was "unlikely that his symptoms [were] explained by his cannabis abuse," but the court found the "majority of the evidence in the record support[ed] the Commissioner. *Id.* at 538. Thus, the court affirmed the finding that substance abuse was a material factor for Kluesner's application for benefits. Similarly, here, the ALJ's conclusion is supported by the recommendations of physicians and opinion that Plaintiff's mental condition was related to his marijuana use.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the Appeals Council did not err in declining to consider the additional evidence submitted by Plaintiff, and Plaintiff fails to show any bias by the ALJ or vocational expert. Finally, Plaintiff has waived any challenge to the ALJ's conclusion that his substance use was a material factor. Accordingly, the Court **ORDERS**:

1.   The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.   The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant, the Commissioner of Social Security, and against Plaintiff David Winkler.


IT IS SO ORDERED.

Dated:   __September 27, 2019__         _____/s/ Jennifer L. Thurston__
                                        UNITED STATES MAGISTRATE JUDGE